UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO.  17-CR-0156-2 |
| | § | |
| MARCUS T. WEATHERSBY | § | |

## UNITED STATES' SENTENCING MEMORANDUM

Marcus T. Weathersby ("Weathersby") participated in a fraudulent scheme that introduced second-hand prescription medication into the retail pharmaceutical market. The prescription medication was dispensed legally to Medicaid recipients who then sold it on the street for pennies on the dollar. After the diverted prescription medication was aggregated into wholesale quantities, with no regard to quality control, it was sold to Green Valley Medical Distributors, LLC ("Green Valley"). Green Valley, a wholesale distributor of pharmaceuticals, sold the second-hand prescription medication as if it was direct from the manufacturer.

Weathersby's co-conspirator, Kenneth J. Coleman ("Coleman"), recruited Weathersby into the scheme, but Weathersby was Coleman's willing deputy. Weathersby was more than Coleman's paper nominee, he was Coleman's alter ego to the other conspirators and his agent on the ground. Weathersby was the backbone of the Houston operation, and the United States asks this Court to sentence him to a term of incarceration in the upper half of the advisory guidelines range.

I.      FACTS

A.  **Background of Investigation**

In December 2010, Weathersby, at Coleman's direction, established Acacia Pharma Distributors, Inc. ("Acacia") as a Mississippi corporation. Although Weathersby was listed as the

incorporator and registered agent of Acacia, Coleman was the true beneficial owner of the corporation and maintained complete control over Acacia.

In July 2011, again at Coleman's direction, Weathersby drove Darryl Colbert ("Colbert") to Mississippi and instructed Colbert to incorporate Four Corner Suppliers, Inc. ("Four Corner"). As with Acacia, although Colbert was listed as the incorporator and registered agent of Four Corner, Coleman was the true beneficial owner who maintained complete control over the corporation.

Acacia and Four Corner purported to be legitimate wholesale distributors of pharmaceuticals licensed and operating in Mississippi, but in fact, Coleman and Weathersby used these corporations to facilitate the second-hand sale of prescription medication to Green Valley. At Coleman's direction and in furtherance of the scheme, Weathersby opened bank accounts held in the name of Acacia. Weathersby also drove Colbert to various banks and instructed him to open accounts in the name of Four Corner.

Coleman knew that federal regulations required wholesale distributors of prescription medication to provide to a buyer a written statement identifying each prior sale, purchase, or trade of the medication. This statement, called a "pedigree," had to provide the business name and address of all parties to these prior transactions, starting with the manufacturer. Coleman and Weathersby created false pedigrees that concealed the true source of the prescription medication, as well as the number of prior sales, purchases, and trades of that prescription medication that had taken place prior to their shipment from Acacia and Four Corner to Green Valley. Green Valley withheld payment for the prescription medication shipped from Acacia and Four Corner until it had received these false pedigrees.

Coleman and Weathersby knew that United States law required banks to file a report of any currency transaction involving more than $10,000 in U.S. currency. Banks filed this report, known as a Currency Transaction Report ("CTR"), with the United States Department of the Treasury.  Between February 4, 2011, and July 21, 2012, Weathersby, acting at Coleman's direction, withdrew or caused others to withdraw $2,991,867.76 in U.S. currency from bank accounts held in the names of Acacia and Four Corner. Weathersby withdrew or caused Colbert to withdraw currency in amounts under $10,000 per transaction in an effort to prevent the banks from filing CTRs. Weathersby delivered this cash to Coleman or Coleman's designee.

Coleman, and to a lesser extent, Weathersby, unlawfully enriched themselves by using the proceeds generated from the illegal sale of second-hand prescription medication. In conjunction with the scheme described above, Coleman and Weathersby laundered more than $2.9 million through the bank accounts held in the names of Acacia and Four Corner, including funds received from Green Valley for the purchase of diverted prescription medication, funds paid to illicit suppliers and co-conspirators, and structured cash withdrawals.

**B.  <u>Terms of the Parties' Plea Agreement</u>**

On February 16, 2018, Weathersby entered a guilty plea to Count Two of the indictment, which charged him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). In the written plea agreement (Dkt. No. 52), the parties stipulated that U.S.S.G. § 2S1.1(a)(2) should be used to calculate the advisory guidelines range and that Weathersby would admit to the forfeiture allegation in the indictment and consent to a money judgment in the amount of $2,991,887.76, pursuant to Fed. R. Crim. P. 32.2(b)(4).

Applying U.S.S.G. § 2S1.1(a)(2), the parties agreed that Weathersby's base offense level was eight, and that the loss arising from his relevant conduct was $2,991,867.76. According, this

raises Weathersby's offense level is enhanced by 16 levels pursuant to U.S.S.G. §§ 2S1.1(a)(2) and § 2B1.1(b)(1)(I). The parties further stipulated that Weathersby qualified for a two-level enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B) because he was convicted under 18 U.S.C. § 1956 and a three level enhancement pursuant to U.S.S.G. § 3B1.1(b) for his role as a manager or supervisor of the scheme. After applying a three-level reduction for acceptance of responsibility as provided in U.S.S.G. § 3E1.1(a), Weathersby's adjusted offense level would be 26.

## II.    CALCULATION OF THE SENTENCING GUIDELINES RANGE

The United States objects to the Probation Officer's determination of Weathersby's base offense level as calculated in the Presentence Investigation Report ("PSR"), insomuch as it applies U.S.S.G. § 2S1.1(a)(1) of the sentencing guidelines. The United States asks this Court to instead apply U.S.S.G. § 2S1.1(a)(2) to calculate Weathersby's base offense level, as contemplated in the parties' plea agreement.

The sentencing guidelines provide that the Court should use U.S.S.G. § 2S1.1(a)(1) when "the offense level for the underlying offense from which the laundered funds were derived" if (a) the defendant committed the underlying offense, *and* (b) the offense level for that offense can be determined. *See* U.S.S.G. § 2S1.1(a)(1). If both these factors are not satisfied, the Court must instead apply U.S.S.G. § 2S1.1(a)(2).

With respect to the first prong, the United States has not taken the position that Weathersby could be found guilty for the specified activity underlying the conspiracy to commit money laundering charged in this case (*i.e.*, health care fraud, in violation of 18 U.S.C. § 1347). As acknowledged in the plea agreement, Weathersby knowingly participated in a scheme to facilitate the sale of second-hand prescription medication, and the defendant was aware that the second-hand medication for which he was facilitating the sale had been dispensed initially to

Medicaid recipients who were reselling this medication to underground channels. However, although Weathersby certainly had the requisite knowledge and intent to be convicted of the conspiracy to commit money laundering with respect to the sale of second-hand prescription medication, his involvement in the underlying scheme was arguably too remote to prove that he had obtained "money or property owned by, or under the custody or control of, any health care benefit program," as required under 18 U.S.C § 1347. *See United States v. Imo*, 739 F.3d 226, 235-36 (5th Cir. 2014).

Moreover, the United States does not believe that the appropriate offense level for Weathersby's role in the underlying the health care offenses could be correctly determined if the Court applied U.S.S.G. § 2S1.1(a)(1). Simply put, the government does not have an accurate estimate of the total loss to the Medicaid program attributable to Coleman and Weathersby for their respective roles in what was a much larger scheme that spanned the nation.

For example, fifty defendants were prosecuted for their roles in this same scheme in the Southern District of New York. *See United States v. Viera*, et al, Case No.1:11-CR-1072 (S.D.N.Y.). Many of the defendants in that case, including a cooperating witness in this prosecution, were required to stipulate to the entry of restitution judgments against them in amounts as high as $100 million. *Id*., Dkt. No. 1228. Another Houston resident charged in the New York case, Kenneth Nelson, was ordered to pay $30 million in restitution for his part of the scheme, which ran conterminously with Coleman's and Weathersby's participation. *Id.*, Dkt. No. 1232.

Indeed, more than $30 million (combined) flowed through the bank accounts held in the names of Acacia and Four Corner, including funds received from Green Valley for the purchase of diverted prescription medication, and funds paid to illicit suppliers of that medication.

However, the United States does not believe that $30 million is an accurate measure of the loss to Medicaid attributable to Coleman and Weathersby.

The Probation Officer's proposal to use $2.9 million as the measure of Weathersby's gain from the health care fraud is equally problematic. In negotiating the plea agreement in this case, the parties stipulated to using the amount of cash that Weathersby and Coleman structured out of the corporate bank accounts ($2.9 million) as the value of the laundered funds for the purposes of calculating the advisory guidelines range. Although the United States believes that the $2.9 million figure is a fair approximation of Weathersby's "piece" of the conspiracy (even though the total amount of money laundered through the scheme was substantially higher), the government does not assert that the $2.9 million represents Weathersby's personal gain in this case.

The government concedes that it has not identified any other cases in the Fifth Circuit in which the United States has argued *against* the application of U.S.S.G. § 2S1.1(a)(1). For instance, in *United States v. Stanford*, 823 F.3d 814, 848 (5th Cir. 2016), government argued for, and the Fifth Circuit upheld, the application of U.S.S.G. § 2S1.1(a)(1) in the case of an attorney who was charged as part of a conspiracy to distribute synthetic marijuana. However, all of the Fifth Circuit cases that discuss the application of this guidelines section at sentencing are inapposite to the facts presented here. Instead, the government respectfully suggests that the Eleventh Circuit's decision in *United States v. Sotto*, 380 F. App'x 852, 861 (11th Cir. 2010), is more instructive in this case, even if that decision is not binding on this Court.

Sotto was charged for her involvement in a conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, as well as conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). At sentencing, Sotto argued that the court should not hold her responsible

for the entire amount of the loss to Medicaid because she was not involved in the Medicaid fraud conspiracy when it began. Sotto instead argued that the district court should apply U.S.S.G. § 2S1.1(a)(1), but limit the loss attributable to her to the amount of money she laundered.

The government argued that the district court should hold Sotto responsible for the entire loss arising from the Medicaid conspiracy.  In the alternative, the government argued that if the court determined that Sotto should not be held responsible for the full loss from the Medicaid conspiracy because it could not reasonably determine amount of the loss attributable to her,  she should therefore be sentenced under U.S.S.G. § 2S1.1(a)(2) based on the amount of funds she laundered.

Adopting the government's position, the district court determined that "the amount of overall Medicare fraud attributable to Sotto from the underlying offense could not be determined and rejected Sotto's argument that the amount of loss attributable to her was the amount of money she laundered." *Id*. The district court therefore applied U.S.S.G. § 2S1.1(a)(2) to determine Sotto's total offense level, and the Eleventh Circuit upheld the district court's sentencing calculation on appeal.

Based on the parties' plea agreement, and the arguments outlined above, the United States respectfully submits that justice requests that the Court apply U.S.S.G. § 2S1.1(a)(2) to determine Weathersby's applicable sentencing guidelines range.

## III.    APPLICABLE LAW FOR SENTENCING

Although *United States v. Booker* held that the guidelines are no longer mandatory, district courts must "consult" the guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing

proceedings by correctly calculating the applicable guidelines range," which "should be the starting point for the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50, n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence from criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## A.  The Government's Sentencing Recommendation

The United States asks this Court to impose a sentence of imprisonment in the upper half of the advisory guidelines range to reflect the seriousness of and to provide just punishment for the offense, and to protect the public from further crimes of the defendant. The United States believes a sentence in the upper half of the guidelines range is sufficient, but not greater than necessary to comply with the purposes of sentencing.

Criminal endeavors often produce large amounts of money in a comparatively short period of time. *See, e.g.* S.Rep. No 433, 99th Cong., 2d Sess. 4 (1986) ("[W]ithout money laundering, drug traffickers would literally drown in cash"). For example, Weathersby's active role in the second-hand prescription fraud was less than two years, and the overt structuring activities occurred in less than 18 months. While suspicious, and unprecedented, amounts of money must be disguised to appear as legitimate income, the movement of money through nominee accounts also shields the perpetrators of the underlying unlawful activity from detection increasing the likelihood that the activity will continue unabated. *See, e.g.* United States Department of Treasury, *Layering*, Money Laundering Updates, Mar. 1991, at 9, 9 (purpose of money laundering is to conceal the illicit sources of monies by "creating the appearance of legitimate wealth"). An unlawful scheme can remain under the radar much longer when the illegal payments and income can be disguised through money-laundering. *See, e.g.* Money Laundering: Hearing Before Senate Comm. On the Judiciary, 99th Cong., 1st Sess. 30 (1985) ("without the means to launder money, thereby making cash generated by a criminal enterprise appear to come from a legitimate source, organized crime could not flourish as it now does."). Here, Weathersby's activities both promoted the continuance of the underlying health care fraud and concealed the flow of illegal money from law enforcement. The United States argues that the nature of the crime and Weathersby's participation in the overall scheme is adequately represented by the advisory guidelines range of imprisonment.

The United States' request that the Court sentence Weathersby at the higher end of the range is based on the inadequacy of Weathersby's scored criminal history to represent the danger he poses to the public in light of his possession of a firearm during and in connection with the offense conduct. The PSR indicates that Weathersby pled guilty in 1996 to aggravated assault for

shooting a man during an altercation. PSR ¶ 61. He was sentenced to seven years' deferred

adjudication probation. *Id.* In 2015, Weathersby pled guilty to illegal possession of a stolen gun,

a .45 caliber Ruger model P90 handgun, and again was sentenced to deferred adjudication

probation. PSR ¶ 62. A bench warrant issued for his arrest after he failed to report to probation as

ordered. *Id.*

On June 10, 2011, following a tip from Federal Express that large shipments of

pharmaceuticals were being delivered to a storage facility in Houston, officers with the Houston

Police Department arrested Weathersby at the U-Haul storage location he and Coleman used to

house the pharmaceuticals before they could be reshipped to Green Valley. At the time his arrest,

officers found a .45 caliber semi-automatic Taurus pistol under three envelopes containing over

$25,000 in cash. Weathersby admitted the gun belonged to him.[1]

On three separate occasions, Weathersby was arrested while in possession of a handgun,

including once while he was engaged in the instant offense conduct. After the Taurus pistol was

confiscated following his 2011 arrest, Weathersby was arrested again in 2015 while in

possession of a stolen Ruger handgun. Weathersby's ability and willingness to acquire a stolen

firearm itself presents a danger to the public. That he carried a firearm while engaging in

criminal activity intensifies the danger and increases the likelihood that Weathersby would use

the firearm to protect himself and the cash or contraband he transports as part of his criminal

activity.

The United States does not seek an upward variance based on the underrepresentation of

Weathersby's criminal conduct. The United States asks only that the Court take into account

---

[1] *See* Ex. A (Houston Police Department report from June 10, 2011 arrest).

when determining his sentence the threat to the public posed by Weathersby's repeated

possession of firearms.

**IV.     CONCLUSION**

The United States respectfully requests this Court to impose a term of incarceration in the

upper half of the properly calculated advisory guidelines range. The United States submits that

this sentence is sufficient, but not greater than necessary, to serve the legitimate purposes of

sentencing set forth in 18 U.S.C. § 3553(a).


Respectfully submitted,

Richard E. Zuckerman
Principal Deputy Assistant Attorney General


Sean Beaty, Trial Attorney
Terri-Lei O'Malley, Trial Attorney
U.S. Department of Justice, Tax Division
Criminal Enforcement Section, Southern Region
601 D St., NW, Seventh Floor
Washington, DC  20579
(202) 616-2717
Sean.P.Beaty@usdoj.gov


CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing motion to be electronically filed with the
Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.


Sean Beaty